Kesner FRANCOIS, A36–470–712, Petitioner,

v.

John ASHCROFT, et al., Respondents.

No. 04–CV–1961 (WJM).

United States District Court,
D. New Jersey.

Nov. 1, 2004.

Regis Fernandez, Newark, NJ, for Petitioner.

Neil R. Gallagher, Assistant U.S. Attorney, Newark, NJ, for Respondents.

## OPINION

MARTINI, District Judge.

Petitioner Kesner Francois filed a petition for writ of habeas corpus under 28 U.S.C. § 2241 seeking a declaration that his removal should be deferred under Article 3 of the United Nations Convention Against Torture ("CAT"). For the reasons stated below, the Court denies the petition for writ of habeas corpus.

## I. BACKGROUND

Kesner Francois is a native and citizen of Haiti. On March 8, 1979, he was admitted as a lawful permanent resident to the United States. In 2003, petitioner visited Haiti three times. It was not until August 19, 2003, when he returned from his third trip, that an immigration inspector realized that Francois had a criminal record. Francois had been convicted on May 8, 1992 for possession of a controlled substance in violation of New Jersey Penal Code 2C:35–10(a)(1). He had also been convicted on October 29, 1997 for aggravated assault in the second degree in violation of New Jersey Penal Code 2C:12–1B(1), which led to a six year sentence in prison.

After his criminal record came to light, Francois was immediately placed in removal proceedings. That day, a Notice to Appear issued, charging Francois with inadmissibility pursuant to §§ 212(a)(2)(A)(i)(II) and 212(a)(2)(A)(i)(I) of the Immigration and Naturalization Act ("INA").[1] During the removal proceedings, Francois conceded that he was removable as charged. Petitioner sought asylum or withholding of removal, but both requests were denied by the presiding Immigration Judge ("IJ").

Petitioner also sought to defer removal to Haiti under Article 3 of the CAT, arguing that if removed to Haiti, he will be indefinitely imprisoned and subjected to torture. Petitioner, not having been imprisoned in Haiti, nor knowing anyone that had been, relied on official and unofficial reports describing the conditions faced by criminal deportees and Haitian prisoners to support his case. These reports were the U.S. State Department's *Country Report on Human Rights Practices—Haiti 2002* ("*2002 Country Report*"), the Human Rights Watch's *World Report 2003—Haiti* ("*World Report 2003*") and the INS Resource Information Center's *Haiti: Information on Conditions in Haitian Prisons and Treatment of Criminal Deportees* ("*Conditions in Haitian Prisons*"). The essential elements of the reports are summarized as follows:

Criminal deportees who are removed to Haiti are routinely imprisoned. The Haitian authorities do this as a preventive measure to prevent returning criminals from further exacerbating the country's already high levels of crime. U.S. criminal deportees are incarcerated in the National

---

1. These provisions set forth different bases of inadmissibility. Conviction of a crime of moral turpitude, 8 U.S.C. § 1182(a)(2)(A)(i)(I), or a crime involving a controlled substance, 8 U.S.C. § 1182(a)(2)(A)(i)(II), renders an alien inadmissible.

Penitentiary with the general prison population. They are held indefinitely, with one exception.[2] If the deportee has a close family member who is willing to claim responsibility, then the deportee may be released approximately three months after incarceration. However, this exception is narrow. The INS Information Resource Center reports that:

> Criminal deportees are released from the National Penitentiary after a close family member presents proof of identification as well as proof of relationship to the deportee and must swear in writing that they will take responsibility for the deportee upon release and further, that they agree that in the event that the deportee is alleged to commit a crime, and is not apprehended, the responsible person will be subject to arrest until such a time that the deportee is apprehended. In 2001, 4–5 families have been subjected to arrest, with one family member imprisoned for three months until the police were able to arrest the deportee. This deters some families from coming forward or following through with the process for releasing their loved ones from detention when first deported to Haiti.

*Conditions in Haitian Prisons* at 4. In addition, not just any family member can claim responsibility for the deportee. Often times, authorities require that a close relative, such as a mother, come forward. In short, detention of a criminal deportee can last anywhere from a short duration to an indefinite duration.

The conditions of Haitian prisons are atrocious. Although the prison population of the National Penitentiary was reduced to 1,700 prisoners in 2002,[3] it remains overcrowded with extremely poor and antiquated facilities. Despite recent improvements in prison administration, "[p]risoners and detainees continue to suffer from a lack of basic hygiene, malnutrition, poor quality health care, and, in some facilities, 24–hour confinement. Most prisons periodically suffered from lack of water, especially in the provinces." *2002 Country Report* at 6. Many prisoners also suffered from diseases, including "preventable diseases such as beriberi, AIDS, and tuberculosis." *Id.* Human rights groups, such as the International Committee of the Red Cross and the Haitian Red Cross, were freely permitted to enter prisons and "monitor conditions, and assist prisoners and detainees with medical care, food, and legal aid." *Id.* at 7.

In addition to suffering under those abysmal conditions, prisoners are also grossly mistreated by prison officials. In its 2001 report, the State Department set forth the following detailed description of mistreatment:

> Police mistreatment of suspects at both the time of arrest and during detention remains pervasive in all parts of the country. Beating with fists, sticks, and belts is by far the most common form of abuse. However, international organizations documented other forms of mistreatment, such as burning with cigarettes, choking, hooding, and kalot marassa (severe boxing of the ears,

---

**2.** The reports use the word "indefinitely" not to connote that the criminal alien will never be released, but to suggest that the person will be held without notice of when they will be released. On average, it appears that most detained deportees were released after several months of imprisonment, although there were instances where people were detained up to 10 months.

**3.** This was the second year in a row that the National Penitentiary's prison population was reduced. From 2001 through 2002, the population was reduced from 2,070 to 1,700, or approximately 200 prisoners per year.

which can result in eardrum damage). Those who reported such abuse often had visible injuries consistent with the alleged maltreatment. There were also isolated allegations of torture by electric shock. Mistreatment also takes the form of withholding medical treatment from injured jail inmates. Police almost never are prosecuted for the abuse of detainees.

*Conditions in Haitian Prisons* at 2 (quoting U.S. State Department's *Country Report on Human Rights Practices—Haiti 2001* ("*2001 Country Report*")).

Petitioner relied on these reports to argue before the IJ that if removed to Haiti and detained, he would be subjected to these appalling conditions, forcing him to endure severe pain and suffering. In other words, he argued that he would be tortured if not granted relief under CAT.

On November 4, 2003, after a full hearing and after reviewing this evidence, the IJ granted petitioner deferral of removal under CAT. Since the parties had stipulated that petitioner would likely be detained by the authorities if deported, the IJ's analysis focused on whether it was more likely than not that Francois would be tortured while detained. In her opinion, the IJ recognized that torture was "a lot more than food deprivation or being crowded in a cell." (IJ Op. at 4). Rather, as she noted, it "has to be very severe either physical or mental cruelty and harm that is calculated to harm one on account of some aspect of that person or calculated to harm the respondent in order to harm others." (*Id.*). The IJ then went on to discuss the facts of this case and how they were similar to those discussed in *Matter of J–E–*, 23 I. & N. Dec. 291, 2002 WL 481156 (BIA 2002) (*en banc*), a case in which the Board of Immigration Appeals ("BIA") held that the criminal alien had not demonstrated that he would more like-

ly than not be tortured if incarcerated in a Haitian prison.

Ultimately, the IJ found that this case differed from *Matter of J–E–* for two reasons. First, the Third Circuit in *Zubeda v. Ashcroft*, 333 F.3d 463 (3d Cir.2003) allegedly expressed concern that the BIA in *Matter of J–E–* found only isolated instances of torture supporting the deportee's claim for relief. Second, even though she had found this case to be factually similar to *Matter of J–E–*, the IJ broke from that binding precedent and found that petitioner had shown more than isolated instances of torture; indeed, she found that petitioner had submitted evidence of systematic and large-scale abuse that rose to the level of torture. Based on those conclusions, the IJ found that this case warranted deferral of removal under CAT.

The Department of Homeland Security ("DHS," formerly known as the Immigration and Naturalization Service) appealed to the BIA. The DHS argued on appeal that petitioner had failed to show that he will more likely than not be tortured if removed to Haiti, and therefore had not satisfied his burden under CAT. On April 8, 2004, the BIA agreed with the DHS and reversed the IJ's decision. The BIA found that this case fell within the ambit of *Matter of J–E–*, i.e., indefinite detention, poor prison conditions, and harsh treatment while imprisoned does not constitute torture under CAT. The BIA also found *Zubeda* to be distinguishable on its facts because that case involved an alien that feared being raped upon return to the Democratic Republic of Congo, where incidents of gang rape, mutilation and mass murder were countrywide and systematic. (BIA Op. at 2).

This petition for writ of habeas corpus followed. On April 28, 2004, this Court stayed Francois' transfer outside the Dis-

trict of New Jersey pending resolution of this petition. Francois contends that there are two reasons why his petition for writ of habeas corpus should be granted: 1) the BIA erred when it reversed the IJ's decision by relying on *Matter of J–E–* when *Matter of J–E–* had been overruled by the Third Circuit's *Zubeda* decision; and 2) regardless of *Matter of J–E–'s* validity, the BIA erred because the record in this case, unlike the record in *Matter of J–E–*, demonstrates that criminal deportees are subjected to widespread and systemic torture in Haitian prisons.

## II. LEGAL STANDARD

■ This Court has habeas jurisdiction under 28 U.S.C. § 2241 to review a petition alleging violations of Article 3 of CAT. *Ogbudimkpa v. Ashcroft*, 342 F.3d 207, 222 (3d Cir.2003). However, as the Third Circuit recently articulated, this jurisdiction is limited in breadth. A court's review of a habeas proceeding brought under § 2241 "must be confined to questions of constitutional and statutory law." *Bakhtriger v. Elwood*, 360 F.3d 414, 424 (3d Cir.2004). A court may not engage in "the broader species of review for substantial evidence and abuse of discretion typical of APA challenges." *Id.* at 423; *see also Cadet v. Bulger*, 377 F.3d 1173, 1184 (11th Cir.2004) (citing *Bakhtriger* and stating that "[a]ll circuit courts to decide the scope of habeas review ... have concluded that habeas review of administrative factual findings or the exercise of discretion is impermissible"); *Latu v. Ashcroft*, 375 F.3d 1012 (10th Cir.2004) (holding that the district court did not have habeas jurisdiction to review the attorney general's discretionary decision to commence proceedings in a particular

city). "[A]lthough review of a matter of law encompasses deciding whether legal principles have been properly applied to undisputed facts, it does not encompass deciding the factual issues themselves." *Bakhtriger*, 360 F.3d at 425 (citing *Ogbudimkpa*, 342 F.3d at 222).

■ Respondent argues that under *Bakhtriger* this Court is without jurisdiction to review petitioner's habeas petition. Respondent characterizes Francois' petition as seeking a review of the Board's factual determination that petitioner failed to proffer sufficient evidence to satisfy his burden of proof under CAT. That characterization is not entirely correct.

Although the line between matters of law and fact may be at times blurry, petitioner successfully raised legal issues that fall within the Court's jurisdiction. Those issues are: 1) did *Zubeda* overrule *Matter of J–E–*; and 2) do indefinite detention, deplorable prison conditions and mistreatment by Haitian prison authorities constitute "torture" as defined by CAT? The first issue clearly presents a pure question of law properly before this Court. The second issue, although seemingly a question of fact, is actually a legal question based on undisputed facts. *See Cadet*, 377 F.3d at 1192 (concluding that "whether the conditions in Haitian prisons constitute torture is a mixed question of law and fact as we must apply CAT's legal definition of 'torture' to the facts of what happens in Haiti's prisons"). Accordingly, this Court has jurisdiction to consider petitioner's claims.

## III. DISCUSSION

Article 3 of CAT[4] prohibits the United States from returning a criminal alien to

4. The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment of Punishment, G.A. Res. 39/46, Annex, 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/39/51 (1984).

another country where there are substantial grounds to believe that he or she will be subjected to torture.[5] Congress implemented CAT by enacting the Foreign Affairs and Restructuring Act of 1998 ("FARRA").[6] Section 2242(a) states that the United States will not remove "any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture." FARRA § 2242(a). FARRA required that implementing regulations be promulgated by the appropriate agencies, at that time the Justice Department, to implement Article 3 of CAT. FARRA § 2242(b).

■ Pursuant to the implementing regulations, a criminal alien seeking relief under CAT must show by objective evidence that it is more likely than not that he or she will suffer torture if deported. 8 C.F.R. § 208.16(c)(2); *Zubeda v. Ashcroft,* 333 F.3d 463, 471 (3d Cir.2003) (stating that the standard for relief "has no subjective component, but instead requires the alien to establish, by objective evidence, that he[/she] is entitled to relief"). "For an act to constitute torture it must be: (1) an act causing severe physical or mental pain or suffering; (2) intentionally inflicted; (3) for a proscribed purpose; (4) by or at the instigation of or with the consent or acquiescence of a public official ... and (5) not arising from lawful sanctions." *Matter of J–E–,* 23 I. & N. Dec. 291, 297, 2002 WL 481156 (BIA 2002) (citing 8 C.F.R. § 208.18(a)). An act is not considered to be torture if it causes pain or suffering "arising from, inherent in or incidental to lawful sanctions." 8 C.F.R. § 208.18(a)(3). "Lawful sanctions include judicially imposed sanctions and other enforcement actions authorized by law, including the death penalty, but do not include sanctions that defeat the object and purpose of the Convention Against Torture to prohibit torture." *Id.*

"Torture is an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment that do not amount to torture." 8 C.F.R. § 208.18(a)(2). The CAT clearly distinguishes between torturous acts and other acts of cruelty. *Matter of J–E,* 23 I. & N. Dec. at 295. "The severity of the pain and suffering inflicted is a distinguishing characteristic of torture." *Id.*

### A. *Matter of J–E–, Zubeda,* and the Specific Intent Requirement

■ Under the implementing regulations, torture has an intent requirement. Although severe pain or suffering must be shown to be "intentionally inflicted" to constitute torture, 8 C.F.R. § 208.18(a), it need not be shown that the torturer "specifically intended" to torture the individual. *Zubeda v. Ashcroft,* 333 F.3d 463, 473 (3d Cir.2003); *but see* 8 C.F.R. § 208.18(a)(5) ("In order to constitute torture, an act must be *specifically intended* to inflict severe physical or mental pain or suffering.") (emphasis added). Rather, the implementing regulation's careful choice of words— "intentionally inflicted"—seeks to exclude

---

**5.** Article 3 of CAT states:

> 1. No State Party shall expel, return *("refouler")* or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture.
>
> 2. For the purpose of determining whether there are such grounds, the competent authorities shall take into account all relevant considerations including, where applicable, the existence in the State concerned of a consistent pattern of gross, flagrant or mass violations of human rights.

**6.** Pub. L. No. 105–277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681–822 (1988) (codified as Note to 8 U.S.C. § 1231).

"severe pain or suffering that is the unintended [or accidental] consequence of an intentional act." *Id.;* 8 C.F.R. § 208.18(a)(5).

Petitioner claims that the BIA deviated from this established construction of the term torture by wrongly requiring petitioner to show a specific intent to torture. In its opinion, the BIA stated in relevant part: "There has been no evidence presented that the respondent will more likely than not be intentionally subjected to persecution or torture in Haiti." (BIA Op. at 2). Petitioner latches onto that sentence and argues stridently that the BIA made that statement while relying on its *en banc* decision *Matter of J–E–*. According to petitioner, *Matter of J–E–* imposed a specific intent to torture requirement under CAT. Petitioner maintains that the Third Circuit in *Zubeda v. Ashcroft,* 333 F.3d 463 (3d Cir.2003) "squarely rejected" the holding of *Matter of J–E–,* when it held that "intentionally inflicted" does not include a specific intent requirement. Thus, petitioner argues that the BIA's reliance on *Matter of J–E–* is reversible error. Petitioner posits that if *Zubeda,* not *Matter of J–E–,* is followed, the BIA would have had no choice but to affirm the IJ's decision.

Petitioner's argument, although ably made, is wrong for two reasons. First, even assuming that the BIA relied on *Matter of J–E–* in making that statement, *Matter of J–E–* did not impose a specific intent requirement. As one other district court persuasively concluded, *Matter of J–E–* did not "impose any burden on an alien to prove the subjective state of mind of his putative torturer." *Saint Fort v. Ashcroft,* 223 F.Supp.2d 343, 345 n. 4 (D.Mass.2002), *aff'd,* 329 F.3d 191 (1st Cir.2003). Rather, when looked at more closely, this Court believes that *Matter of J–E–* is consistent with a general intent standard. The BIA's primary discussion of an intent require-

ment in *Matter of J–E–* is the section that discusses the inhumane prison conditions awaiting criminal deportees. The BIA concluded that "[a]lthough Haitian authorities are intentionally detaining criminal deportees knowing that the detention facilities are substandard, there is no evidence that they are intentionally and deliberately creating and maintaining such prison conditions in order to inflict torture." *Matter of J–E,* 23 I. & N. Dec. at 301. Instead, the evidence showed that prison conditions were a result "of budgetary and management problems as well as the country's severe economic difficulties." *Id.* Despite these problems, the BIA recognized that the "Haitian Government is attempting to improve its prison systems." *Id.* Further, the record before the BIA demonstrated that international human rights groups were granted access to prisoners to both monitor their conditions and assist them "with medical care, food, and legal aid." *Id.* In light of these reasons, the BIA in *Matter of J–E–* essentially found that the "inexcusable prison conditions" were "unintentional" under 8 C.F.R. § 208.18(a)(5) and, therefore, did not constitute torture under CAT.

This Court believes that to find *Zubeda* overruled *Matter of J–E–* would create an incongruous and unnecessary result. The Third Circuit was well aware of *Matter of J–E–* when it decided *Zubeda,* having relied on it when discussing the legal definition of torture and having discussed it when reviewing the BIA's decision. *See Zubeda,* 333 F.3d at 472, 475, 477–79. Further, it also must have been aware that dissenting members of the BIA in *Matter of J–E–* accused the majority of grafting a "specific intent" requirement onto the burden of proof. *See Matter of J–E,* 23 I. & N. Dec. at 316. And yet, despite the Third Circuit's obvious familiarity with *Matter of J–E–,* the court did not discuss, cite to or even allude to *Matter of J–E–* when hold-

ing that there is no specific intent requirement. If indeed *Matter of J–E–'s* holding that J–E had failed to carry his burden under CAT hinged on a specific intent requirement, and the Third Circuit overruled that holding, one would imagine the Third Circuit would do so expressly. In light of the above, the Court is reluctant to read *Zubeda* as superseding the holding of *Matter of J–E–* based on its discussion of an intent requirement.

Second, even if this Court found that *Zubeda* superseded *Matter of J–E–* as to a specific intent requirement, petitioner would still not be entitled to relief. This Court must defer to the BIA's reasonable interpretations of the immigration statutes and regulations. *Julmiste v. Ashcroft,* 212 F.Supp.2d 341, 345 (D.N.J.2002) (citing *Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 865–66, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)); *see also Cadet v. Bulger,* 377 F.3d 1173, 1185–86 (11th Cir.2004) (stating that the BIA is entitled to "great deference" when interpreting and applying its own regulations). A fair and accurate reading of *Matter of J–E–* shows that the BIA relied on more than a failure to show intent when it rejected J–E's claims. With respect to the inhumane prison conditions and physical abuse of prisoners, the BIA distinguished between torturous acts and those "lesser forms of cruel, inhuman or degrading treatment or punishment" based on the severity of pain or suffering. *See id.* at 303–04. After considering all of the evidence of inhumane prison conditions and mistreatment of prisoners, the BIA concluded that there were only isolated instances of mistreatment that rose to the level of torture. *Id.* at 302. Those instances were delineated as: "deliberate vicious acts such as burning with cigarettes, choking, hooding, kalot marassa, and electric shock." *Id.* Importantly, the BIA also concluded that all other acts, including in-humane prison conditions, were not severe enough to rise to the level of torture. *Id.* at 304 (concluding that "it is clear that most of the range of mistreatment" described by the country reports falls within the category of "other acts of cruel, inhuman or degrading treatment or punishment," not torture). Thus, in order to succeed under *Matter of J–E–,* petitioner must show more than inhumane prison conditions and isolated instance of torture.

In *Zubeda,* the Third Circuit endorsed this reading of *Matter of J–E–.* When comparing Zubeda's claims with J–E's claims, the Third Circuit justifiably stated:

> Reducing Zubeda's claim to an attack on the kind of inhumane prison conditions that formed the basis of the Board's decision in *Matter of J–E–,* totally ignores the fact that this record is replete with reports from government agencies and human rights organizations that detail what appear to be country wide, systematic incidents of gang rape, mutilation, and mass murder.

*Zubeda,* 333 F.3d at 477. By casting *Matter of J–E–'s* prison conditions in such a light, the Third Circuit clearly perceived them to be something much less than country wide, systematic incidents of torture; indeed, it found them to be "inhumane," which supports the BIA's holding in *Matter of J–E–.*

As discussed above, the IJ believed that *Zubeda* expressed the Third Circuit's concern that the BIA found only isolated instances of torture in *Matter of J–E–.* But, as the above excerpt demonstrates, the Third Circuit was not concerned with the findings made in *Matter of J–E–,* but with the BIA's conclusion in the *Zubeda* case that the record was similar to that of *Matter of J–E–.*

In *Zubeda,* the record painted a very different, more gruesome picture. The

reports showed that rape and other forms of sexual violence were widespread and that soldiers and rebels used sexual violence to terrorize citizens. *Zubeda,* 333 F.3d at 468 (quoting Human Rights Watch: *Eastern Congo Ravaged: Indiscriminate Attacks and Extrajudicial Executions of Civilians* at 5 n. 6). Women would sometimes be taken as sex slaves. *Id.* Some armed forces would "rape women in public and often in the presence of their families and in-laws." *Id.* (quoting U.S. State Department, *2000 Country Reports on Human Rights Practices: Democratic Republic of Congo* (February 2001) at 10–11). Armed forces would also execute hundreds of citizens in a short period of time by slitting their throats or burning them alive. *Id.*

Other evidence was submitted revealing that Zubeda herself suffered from the reign of terror blanketing the Democratic Republic of Congo. While living there, her mom was raped by soldiers. *Id.* at 467. Before her father could complain, Zubeda herself was raped by a group of soldiers while her father and brother were forced to watch. *Id.* After they were done, the soldiers decapitated the father and brother and set the family house on fire while Zubeda's mother and sister were still inside. *Id.* The soldiers then took her as a sex slave; fortunately, she later escaped. *Id.* Given that record, the Third Circuit rightly expressed dismay that the BIA found in a rather cursory fashion that Zubeda's plight was analogous to J–E's. *See id.* at 477, 479. But in doing so, the Third Circuit by no means overruled *Matter of J–E–'s* holding that more than isolated instances of torture need to be shown in order to carry one's burden of proof under CAT.

In summary, *Matter of J–E–* did not impose a specific intent requirement. But even if it did, and *Zubeda* overruled that aspect of the case, *Zubeda* left undisturbed the BIA's legal conclusions that only particularly vicious acts constitute torture under CAT and that petitioner must proffer sufficient evidence of those acts in order to show it is more likely than not that he will be tortured if removed to Haiti. Accordingly, the BIA's reliance on *Matter of J–E–* is not by itself cause for reversal.

### B. Petitioner's Case Is Factually Similar to *Matter of J–E–*

Petitioner argues that even if *Matter of J–E–* is not overruled, his case is distinguishable from *Matter of J–E–* because he has shown more than isolated instances of torture in Haiti. Arguing that the facts of his case are more like that of *Zubeda,* petitioner maintains that he has demonstrated systemic torture in Haitian prisons entitling him to relief under CAT.

The Court is not persuaded that petitioner's case differs from *Matter of J–E–.* Indeed, *Matter of J–E–* is on point and controls the outcome of this case. In *Matter of J–E–,* the Board examined three different types of "acts" by Haitian authorities that criminal deportees potentially faced: indefinite detention, deplorable prison conditions and physical abuse. As stated above, the Board found on the record before it that there were only isolated instances of torture in Haitian prisons and, therefore, J–E failed to carry his burden under CAT.

Petitioner relies on the same three acts to support his case. He argues that if deported as a criminal, he will be detained indefinitely. But, in *Matter of J–E–,* the BIA found that Haiti "has a legitimate interest in protecting its citizens from increased criminal activity." *Matter of J–E–,* 23 I. & N. Dec at 300. As a result, it held that indefinite detention "is a lawful sanction and, therefore, does not constitute torture." *Id.* Recognizing this, petitioner

attempts to circumvent that holding by arguing that the Haitian Government uses indefinite detention as a means to extort money from families. Since a government cannot have a legitimate interest in extorting money from its citizens, petitioner contends that indefinite detention in Haitian prisons can no longer be classified as a "lawful sanction."

Plaintiff's extortion argument is without merit. There is no evidence supporting his argument that the Haitian Government detains criminal deportees as a means for extorting money from their families. The official and unofficial reports before this Court make no mention of extortion as a justification for detaining criminal deportees. Rather, the facts demonstrate that the Haitian Government's release program actually supports its legitimate interest of protecting its citizens. The record demonstrates that the only way close family members can free their jailed relatives is to take responsibility for the deportee by agreeing that they themselves can be arrested if their jailed relative commits a crime and is not apprehended. The record reflects that in at least four to five cases, a family member was arrested and imprisoned until the deportee was apprehended. By holding family members responsible for their jailed relatives' behavior, this program creates an incentive to free only those jailed relatives that are likely to act in accordance with the law and, thus, furthers the government's legitimate interest of taking preemptive measures to keep " 'bandits' from increasing the level of insecurity and crime in the country." *Matter of J–E–*, 23 I.& N. Dec. at 300. Consequently, indefinite detention remains a lawful sanction that does not constitute torture. *See Cadet v. Bulger*, 377 F.3d 1173, 1193 (11th Cir.2004) (agreeing with *Matter of J–E–* that indefinite detention does not constitute torture).

Petitioner argues that the Haitian prisons are in such horrible conditions that simply being subjected to them for one or two days amounts to torture under CAT. (Petitioner's Reply Br. at 12). Although it is true they are horrible, petitioner has not shown that prison conditions are any worse than described in *Matter of J–E–*. It is worth noting that some of the more disturbing facts that the IJ relied on do not actually apply to this case. In her opinion, the IJ described the conditions ostensibly facing criminal deportees, including how:

> individuals are detained in areas that are so tightly confined that the individuals have to sit in tight rows, knees to chin. There are often no toilets, no sink, no room to lie down. People who launder their own clothing, according to this report, can find no clear way sometimes to even have it dry such that mildew and mold invades the skin and causes literally rotting away of skin due to fungus infections or parasite infestations. There is no doctor available to even begin to treat these individuals.

(IJ Op. at 10). Although the report the IJ referred to does indeed make those statements, what the IJ failed to realize was that it made those statements with regards to conditions in police holding cells, which "are even worse than those in the prisons." *Conditions in Haitian Prisons* at 2. Further, the practice of holding criminal deportees in holding cells ended in early 2001, *id.* at 3, and there is no record evidence that ties those conditions to the conditions in the National Penitentiary, which is where petitioner would stay if in fact he is detained.

Since plaintiff has not shown that Haitian prison conditions are so atrocious that they cause severe pain or suffering, they do not constitute torture under CAT. *See Cadet v. Bulger*, 377 F.3d 1173, 1194 (11th

Cir.2004) (concluding that "the conditions of Haiti's prisons qualify as 'cruel, inhuman and degrading under CAT,' not torturous"); *Julmiste v. Ashcroft*, 212 F.Supp.2d 341, 348 (D.N.J.2002) (stating in a habeas case where an Haitian immigrant challenged an order of removal that "the CAT does not provide protection from general ills, such as corruption, poverty and dilapidated prison conditions"). Further, like *J–E–*, petitioner has made no showing that those prison conditions are anything other than the ancillary result of a lawful sanction, and the unintended consequence of "budgetary and management problems as well as the country's severe economic difficulties." Moreover, since *Matter of J–E–*, the Haitian authorities have reduced the number of prisoners in the National Penitentiary by approximately 400, further demonstrating that despite its lack of resources and effective management, the "Haitian Government is attempting to improve its prison system." *Matter of J–E*, 23 I. & N. Dec. at 301.

Lastly, petitioner vehemently argues that if imprisoned, he will be subjected to systemic physical abuse that rises to the level of torture. Petitioner's primary evidence of prisoner mistreatment is the State Department's *2001 Country Report*—the very same report considered by the Board in *Matter of J–E–* and found to demonstrate only isolated instances of mistreatment that constitute torture. Petitioner also relies on the *2002 Country Report*, which contains a very similar description that states in relevant part:

> Police mistreatment of suspects at the time of arrest and during detention remained common in all parts of the country. Beating with fists, sticks, and belts was the most common form of abuse. Persons who reported such abuse often had visible injuries consistent with the alleged mistreatment. There were also

isolated allegations of torture by electric shock. Mistreatment also took the form of withholding medical treatment from injured jail inmates.

*2002 Country Report* at 5. Notably, the 2002 report excised any reference to examples of mistreatment heavily relied upon by petitioner, and the IJ, as evidence of torture—"such as burning with cigarettes, choking, hooding, and kalot marassa (severe boxing of the ears, which can result in eardrum damage)." *See Conditions of Haitian Prisons* at 2 (quoting *2001 Country Report*), *supra.*

Since petitioner has presented no evidence that Haitian prisoners are treated any worse than they were when *Matter of J–E* was decided, under *Matter of J–E–*, his petition must be denied.

## IV. CONCLUSION

The record before this Court demonstrates that criminal aliens deported to Haiti face deplorable and inhumane prison conditions that are anathema to any civilized society. The IJ was deeply disturbed by this record, so much so that she broke with binding precedent and found that it demonstrated "systemic, large-scale abuse and engagement in severe harm that rises to the level [of] torture." (IJ Op. at 20). Although this Court is as disturbed and moved by the same record, it cannot find that the BIA committed legal error when it reversed the IJ's decision. Notwithstanding the abysmal conditions criminal deportees may be exposed to, the record before the Court is not qualitatively different than the record in *Matter of J–E–*. Since *Zubeda* did not supplant *Matter of J–E–*, this Court finds that petitioner has failed to show more than isolated instances of torture occur in Haitian prisons and, therefore, his petition for writ of habeas corpus is denied.[7]

---

**7.** The Court will leave in place the April 28,     2004 Order staying petitioner's transfer out-

## ORDER

Before this Court is Kesner Francois' petition for writ of habeas corpus under 28 U.S.C. § 2241. For the reasons set forth in the Court's accompanying Opinion, and for good cause shown,

**IT IS** on this 1st day of November, 2004 hereby

**ORDERED** that Kesner Francois's petition for writ of habeas corpus is **DENIED.**

side the District of New Jersey pending resolution of any appeal from this decision.