Joseph **THELEMAQUE,** Petitioner,

v.

John **ASHCROFT, et al.,** Respondents.

Nos. 3:04–CV–676(MRK),
3:04–CV–1727(MRK).

United States District Court,
D. Connecticut.

March 28, 2005.

Jonathan M. Levine, Silver, Golub & Teitell, Stamford, CT, for Petitioner.

Krishna R. Patel, U.S. Attorney's Office, New Haven, CT, for Respondents.

Joseph Thelemaque, Uncasville, CT, pro se.

### MEMORANDUM OF DECISION

KRAVITZ, District Judge.

Joseph Thelemaque is detained by the United States Bureau of Immigration and Customs Enforcement ("BICE") at the Corrigan–Radgowski Correctional Center in Uncasville, Connecticut, pending removal to his native Haiti. Currently pending before this Court are two petitions by Mr. Thelemaque for a writ of habeas corpus pursuant to 28 U.S.C. § 2241, filed under different docket numbers. Hearing no ob-

jection from the parties,[1] the Court hereby consolidates Mr. Thelemaque's two pending habeas petitions, *Thelemaque v. Ashcroft et al.,* No. 3:04CV676(MRK) (lead case), and *Thelemaque v. Department of Homeland Security,* No. 3:04CV1727(MRK) (member case).[2]

Mr. Thelemaque's habeas petition in 3:04CV676(MRK) (lead) [doc. # 1] seeks to enjoin Respondents from removing him to Haiti, claiming that the Board of Immigration Appeals ("BIA") misapplied the legal standards for determining whether he was eligible for relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT" or "Convention"),[3] as implemented by the Foreign Affairs Reform and Restructuring Act ("FARRA"), Pub.L. No. 105–277, Div. G, Title XXII, § 2242, 112 Stat. 2681–822 (Oct. 21, 1998) (codified as Note to 8 U.S.C. § 1231), and the Department of Justice's corresponding regulations at 8 C.F.R. §§ 208.16–208.18. In particular, Mr. Thelemaque contends that the BIA erred when it concluded that the possibility of Mr. Thelemaque's indefinite detention in the admittedly brutal conditions of Haiti's prisons did not constitute torture within the meaning of CAT, FARRA and the corresponding regulations. Mr. Thelemaque's habeas petition in 3:04CV1727(MRK) [doc. # 1] challenges the constitutionality of his continued detention for more than six months since denial of his BIA appeal and issuance of his final order of deportation, invoking the Supreme Court's decision in *Zadvydas v. Davis,* 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001).

Haiti is a country plagued by great poverty and persistent political instability. It is one of the poorest countries in the world, with living conditions that are brutal and harsh for all but a handful of its citizens. The general populace is chronically under- or unemployed, ill-housed and malnourished.[4] The country's infrastructure is dilapidated, its public health system is stressed to the breaking point and its educational system is almost nonexistent.[5] Perhaps not surprisingly, the conditions of Haiti's prisons are even worse. "Substandard" does not even begin to capture the conditions of Haiti's jails. In a word, they are deplorable.

Yet, there is no evidence in the record of this case that Haitian authorities have intentionally sought to make Haiti's prisons miserable in order to cause severe pain and suffering to criminal returnees like Mr. Thelemaque, or that Mr. Thelemaque, in particular, is more than likely to be subject to beatings or illegal punishment. In short, Mr. Thelemaque has not shown that the horrid conditions in Haitian prisons are anything other than the regrettable, though ancillary, results of

1. *See* Respondents' Mem. of Law in Opp'n [3:04CV1727(MRK) (member) doc. # 6], at 27.

2. Though captioned as a writ of mandamus, the Court follows its usual practice of construing Petitioner's filing as a writ of habeas corpus.

3. United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, S. Treaty Doc. No. 100–20 (1988), 1465 U.N.T.S. 85, *reprinted in* 23 I.L.M. 1027 (1984).

4. The United Nations estimates that approximately 42% of children under five in Haiti are chronically malnourished. *See* U.S. State Department, Bureau of Democracy, Human Rights, and Labor, *Country Report on Human Rights Practices—Haiti 2004,* \*13 (Feb. 28, 2005), *available at http://www.state.gov/g/drl/rls/hrrpt/2004/41764.htm* (hereinafter *"State Department Country Report—Haiti 2004 "*).

5. According to the Haitian government, 40% of children never attend school. *See State Department Country Report—Haiti 2004,* at \*14.

that nation's pervasive economic and social distress. While not in any way condoning the brutish conditions of Haiti's prisons, the Court concludes that the BIA did not err when it denied Mr. Thelemaque's application for relief from removal under CAT or FARRA. As a result, the Court DENIES Mr. Thelemaque's habeas petition in 3:04CV676(MRK) (lead) [doc. # 1]. In light of the Court's conclusion, unless Mr. Thelemaque chooses to pursue his claims to the Second Circuit, he will be immediately deported to Haiti, thus mooting his *Zadvydas* claim in habeas petition 3:04CV1727(MRK) (member) [doc. # 1]. The Court DENIES that petition as well.

## I.

Mr. Thelemaque, a 44–year old native of Haiti, was admitted to the United States on or about November 27, 1974, as an immigrant. His mother and siblings are United States citizens, as is his thirteen year-old son. Mr. Thelemaque has no known relatives remaining in Haiti.

Mr. Thelemaque has a lengthy criminal record, though only two of his prior convictions are directly relevant here.[6] On August 15, 1989, Mr. Thelemaque was convicted in the Connecticut Superior Court of robbery in the third degree, in violation of Conn. Gen.Stat. § 53a–136. On August 18, 1989, Mr. Thelemaque was also convicted in the Connecticut Superior Court of possession of narcotics in violation of Conn. Gen.Stat. § 21a–279(a). Based on these two convictions, in March 1999, the former Immigration and Naturalization Service ("INS") initiated proceedings to

---

**6.** The rest of Mr. Thelemaque's criminal history is as follows: in January 1980, he was convicted of attempted robbery in the second degree, for which he was sentenced to one year's imprisonment, and possession of stolen property in the second degree, for which he was sentenced to one year's imprisonment; in March 1980, he was convicted of petit larceny, for which he was sentenced to ninety days' imprisonment; in August 1980, he was convicted of disorderly conduct, for which he was sentenced to time served; in October 1980, he was convicted of criminal possession of marijuana in the fifth degree, for which he was sentenced to ninety days' imprisonment; in December 1980, he was convicted of criminal possession of marijuana in the fifth degree, for which he was sentenced to four days' imprisonment; in May 1981, he was convicted of criminal possession of a controlled substance in the seventh degree, for which he was sentenced to ninety days' imprisonment; in August 1981, he was convicted of attempted criminal possession of stolen property in the third degree, for which he was sentenced to sixty days' imprisonment; in December 1981, he was convicted of resisting arrest, for which he was sentenced to fifteen days' imprisonment; in August 1984, he was convicted of criminal possession of a controlled substance in the seventh degree, for which he was sentenced to sixty days' imprisonment; in December 1985, he was convicted of criminal possession of a controlled substance in the seventh degree, for which he was sentenced to sixty days' imprisonment; in July 1986, he was convicted of criminal possession of a controlled substance, for which he was sentenced to one year's imprisonment; and in March 1988, he was convicted of criminal possession of a controlled substance and disorderly conduct, for which he was sentenced to time served.

Apparently, on October 27, 1994, Mr. Thelemaque also was convicted in the Connecticut Superior Court at Meriden, Connecticut for the offense of possession of narcotics, though in his hearings before an Immigration Judge in 1999 regarding his removal, Mr. Thelemaque denied that he pled guilty to that particular offense. *See* Transcript of Proceedings before Immigration Judge dated Apr. 27, 1999, attached to Respondents' Mem. of Law in Opp'n [3:04CV1727(MRK) (member) doc. # 6], at Ex. A, at 28–30. Mr. Thelemaque is currently challenging this October 27, 1994 conviction through a habeas petition in the Connecticut state courts. The state habeas petition is the subject of Mr. Thelemaque's currently pending Motion to Amend his Petition for Writ of Habeas Corpus [3:04CV676(MRK) (lead) doc. # 19], which will be addressed in Part V, *infra*.

remove Mr. Thelemaque (who was at that time in INS custody, detained in Oakdale, Louisiana) from the United States as an individual convicted of an aggravated felony and a narcotics crime under Immigration and Nationality Act ("INA") § 237(a)(2)(A)(iii), 8 U.S.C. § 1227(a)(2)(A)(iii), and INA § 237(a)(2)(B)(i), 8 U.S.C. § 1227(a)(2)(B)(i), respectively. On June 7, 1999, an Immigration Judge sitting in Oakdale, Louisiana, ordered Mr. Thelemaque removed to Haiti. Mr. Thelemaque appealed that ruling to the BIA, which affirmed the Immigration Judge's decision on October 29, 1999.

On or around December 17, 1999, Mr. Thelemaque filed a habeas corpus petition in the District of Connecticut, *Thlemaque v. Reno, et al.*, No. 3:99CV2461(JBA),[7] challenging the BIA's affirmance of the Immigration Judge's removal order. Mr. Thelemaque's removal to Haiti was stayed on December 23, 1999, and on August 22, 2002, the District of Connecticut remanded his case to the BIA to have an Immigration Judge determine, in the first instance, whether Mr. Thelemaque was eligible for discretionary relief under INA § 212(c), 8 U.S.C. § 1182(c) (repealed Sept. 30, 1996). *See generally INS v. St. Cyr*, 533 U.S. 289, 326, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (holding that the repeal of § 212(c) could not be applied retroactively to deny § 212(c) relief to an alien who pled guilty to a crime prior to 1996).

In proceedings before an Immigration Judge on remand from the District of Connecticut, Mr. Thelemaque sought, among other things, relief from removal under CAT. Mr. Thelemaque's application under CAT alleged that in October 2002, the Haitian government enacted new proce-

dures for the release of criminal returnees from the Haitian National Penitentiary. *Id.* at ¶ 11–12. According to Mr. Thelemaque, under the new procedures, a criminal returnee can be released from the National Penitentiary only if a close relative appears in person to demand the returnee's release in writing. *Id.* at ¶ 11. Furthermore, a "close relative" allegedly includes only a parent, grandparent, sibling, aunt or uncle. *Id.* Because Mr. Thelemaque does not have an eligible relative in Haiti capable of producing a demand for his release pursuant to the alleged new procedures, he asserts that he will be detained indefinitely in prison conditions that he asserts are so "brutal and life-threatening" that they constitute torture as defined by CAT, FARRA and regulations implementing FARRA. *See* Petition [3:04CV676(MRK) (lead) doc. # 1], at ¶ 8, 12.

On September 22, 2003, the Immigration Judge denied Mr. Thelemaque's application for relief under CAT. Mr. Thelemaque timely filed an appeal, and on March 31, 2004, the BIA affirmed the Immigration Judge's decision, holding that Mr. Thelemaque's claim for relief under CAT was unavailing because the atrocious prison conditions in Haiti, in and of themselves, do not constitute torture within the meaning of the Convention. *See In re Thelemaque*, attached to Respondents' Mem. of Law in Opp'n [3:04CV1727(MRK) (member) doc. # 6], at Ex. A, at 2–4.

## II.

Before addressing the merits of Mr. Thelemaque's claims, the Court must first consider certain preliminary issues.

---

7. The 1999 habeas petition was docketed with a slightly different spelling of Mr. Thele-

maque's last name.

First, in their briefing to the Court, Respondents also argued that the Department of Homeland Security was not a proper respondent to the petition in 3:04CV1727(MRK) (member). *See* Respondents' Mem. of Law in Opp'n [3:04CV1727(MRK) (member) doc. # 6], at 7–10. However, by consolidating Mr. Thelemaque's habeas petitions, the Court has rendered any such argument moot, since Mr. Thelemaque's original habeas petition in 3:04CV676(MRK)(lead) [doc. # 1] named the United States Attorney General as a respondent, as well as Dennis Riordan, the Boston District Director of the United States Citizenship and Immigration Services (USCIS) and Ethan Enzer, Officer in Charge of the Hartford office of USCIS. Furthermore, the Court, on its own motion, hereby substitutes newly appointed Attorney General Alberto Gonzales for former Attorney General John Ashcroft, and adds Michael Chertoff, the newly appointed Secretary of the Department of Homeland Security, Bruce Chadbourne, District Director for the Boston BICE Detention and Removal Field Office, and George Sullivan, Interim Officer in Charge for Hartford BICE Detention and Removal Office as additional respondents. *See Perez v. Loy*, 356 F.Supp.2d 172, 173–74 n. 1 (D.Conn.2005) (ensuring that the two cabinet level officials who may be ultimately responsible for an alien during her detention were respondents).

The Court notes that the recent Supreme Court decision in *Rumsfeld v. Padilla*, —— U.S. ——, 124 S.Ct. 2711, 159 L.Ed.2d 513 (2004), held that "in habeas challenges to present physical confinement—'core challenges'—the default rule is that the proper respondent is the warden of the facility where the prisoner is being held, not the Attorney General or some other remote supervisory official." *Id.* at 2718. However, the Supreme Court

intentionally "left open the question whether the Attorney General is a proper respondent to a habeas petition filed by an alien detained pending deportation." *Id.* at 2718 n. 8. The Second Circuit has also expressly reserved judgment on whether the Attorney General is a proper respondent to a habeas petition filed by an alien detained pending deportation. *See Henderson v. INS*, 157 F.3d 106, 128 (2d Cir.1998) ("In the end, the question of whether the Attorney General is an appropriate respondent in habeas corpus petitions brought by aliens is one that evokes powerful arguments on each side—both at the doctrinal and at the practical level. Accordingly, its resolution should be avoided unless and until it is manifestly needed to decide a real case in controversy."). Many district courts in the Second Circuit have found that the Attorney General is a proper respondent in cases challenging the underlying immigration decision. *See, e.g., Somir v. United States*, 354 F.Supp.2d 215, 217 (E.D.N.Y.2005) ("I join the chorus of judges in the Southern and Eastern Districts of New York who have held that the Attorney General is a proper respondent in immigration cases where the petitioner is challenging the government's efforts to remove him from this country."); *Shehnaz v. Ashcroft*, No. 04CV2578(DLC), 2004 WL 2378371, at *4 (S.D.N.Y. Oct.25, 2004) (explaining that the Attorney General is the proper respondent where the petition is a "non-core petition, that is, where it challenges the underlying immigration decision, as opposed to the physical custody of the petitioner."); *Batista–Taveras v. Ashcroft*, No. 03CV1968(LAK), 2004 WL 2149095, at *6 (S.D.N.Y. Sept.23, 2004) (same); *Garcia–Rivas v. Ashcroft*, No. 04CV292(NRB), 2004 WL 1534156, at *2 (S.D.N.Y. July 7, 2004) (same). Regardless, the Court need not decide to whom the habeas petition should be directed to in

this case, because the Court ultimately denies Mr. Thelemaque's habeas petitions and hence there is ultimately no need to "produce the prisoner's body before the habeas court." *Padilla*, 124 S.Ct. at 2717.

■ Second, as the Second Circuit recently explained in *Wang v. Ashcroft*, 320 F.3d 130 (2d Cir.2003), a district court has jurisdiction to entertain petitions for habeas relief pursuant to 28 U.S.C. § 2241 requesting, among other things, review of BIA decisions denying CAT relief. *See id.* at 140–43; *see also Cadet v. Bulger*, 377 F.3d 1173, 1181–83 (11th Cir.2004) (same); *Singh v. Ashcroft*, 351 F.3d 435, 441–42 (9th Cir.2003) (same); *Ogbudimkpa v. Ashcroft*, 342 F.3d 207, 215–22 (3d Cir. 2003) (same); *Saint Fort v. Ashcroft*, 329 F.3d 191, 200–02 (1st Cir.2003) (same). Thus, this Court has subject matter jurisdiction over Mr. Thelemaque's claim for relief under CAT.

■ Third, the Court must consider the appropriate standard of review. On a writ of habeas corpus, a district court reviews the BIA's conclusions of law *de novo*. *See Zhang v. Slattery*, 55 F.3d 732, 744 (2d Cir.1995). However, a court must accord "substantial deference to the BIA's interpretations of the statutes and regulations that it administers," *Brissett v. Ashcroft*, 363 F.3d 130, 133 (2d Cir.2004) (citing *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Diallo v. INS*, 232 F.3d 279, 285 (2d Cir. 2000)), "rejecting [the BIA's] interpretation only if it is 'arbitrary, capricious, or manifestly contrary to the statute.'" *Evangelista v. Ashcroft*, 359 F.3d 145, 150 (2d Cir.2004) (quoting *Chevron*, 467 U.S. at 844, 104 S.Ct. 2778). "[W]here the relevant statutory provision is silent or ambiguous, a court may not substitute its own construction for a reasonable interpretation made by the administrator of an agen-

cy." *Brissett*, 363 F.3d at 133 (internal quotation marks and citations omitted); *see Osorio v. INS*, 18 F.3d 1017, 1022 (2d Cir.1994) (a court need not accept an "unreasonable interpretation of the BIA").

■ Ordinarily, a district court may not review the factual findings of the BIA on a habeas petition because the scope of habeas review is generally limited to constitutional challenges to detention and allegations of detention "based on errors of law, including the erroneous application or interpretation of statutes." *St. Cyr*, 533 U.S. at 302, 121 S.Ct. 2271; *see Sol v. INS*, 274 F.3d 648, 651 (2d Cir.2001) ("While review of purely legal issues does not necessitate reconsideration of the agency's factual findings or the Attorney General's exercise of her discretion, review of the merits of [a] petition would involve precisely such reassessment of the evidence. This sort of fact-intensive review is vastly different from what the habeas statute plainly provides: review for statutory or constitutional errors.") (internal quotations and citations omitted); *see also Cadet*, 377 F.3d at 1184 ("All circuit courts to decide the scope of habeas review … have limited review of criminal aliens' § 2241 petitions to constitutional challenges and errors of law, and have concluded that habeas review of administrative factual findings or the exercise of discretion is impermissible.") (citing cases).

■ As explained by the Second Circuit in *Wang*, however, a habeas petitioner such as Mr. Thelemaque may challenge "the BIA's application of the particular facts in this case to the relevant law" because such a challenge "falls within the permissible scope of habeas review." *Wang*, 320 F.3d at 143; *see also Auguste v. Ridge*, 395 F.3d 123, 138 (3d Cir.2005) ("[O]n a habeas petition, [a court's] review

... is limited to constitutional issues and errors of law, including both statutory interpretations and application of law to undisputed facts or adjudicated facts, but does not include review of administrative fact findings or the exercise of discretion."). As also noted in *Wang*, "[a]lthough the standard of review of a BIA's decision in a habeas case is generally more limited than on direct review," the Second Circuit has not yet determined the "precise standard to adopt for reviewing a BIA's application of law to fact pursuant to a § 2241 petition." *Wang*, 320 F.3d at 143.

As will be evident below, in this case (as was true in *Wang*) it makes no difference whether the Court engages in *de novo* or a more deferential form of review of the BIA's application of the law to the facts of Mr. Thelemaque's case, because regardless of which standard applies, the Court finds no error in the BIA's assessment of Mr. Thelemaque's request for CAT relief.

### III.

### A.

Article 1 of CAT defines torture as follows:

[T]orture means any act by which severe pain or suffering, whether physical or mental, is *intentionally inflicted* on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only

from, inherent in or incidental to lawful sanctions.

CAT art. 1(1), 23 I.L.M. at 1027 (emphasis added). Furthermore, Article 3 of CAT provides, in relevant part that

[n]o State Party shall expel, return ("*refouler*") or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture. For the purpose of determining whether there are such grounds, the competent authorities shall take into account all relevant considerations including, where applicable, the existence in the State concerned of a consistent pattern of gross, flagrant or mass violations of human rights.

CAT art. 3(1)-(2), 23 I.L.M. at 1028. Finally, Article 16 of CAT distinguishes between torture as defined in Article 1(1), and "other acts" of cruel and degrading treatment, stating:

Each State Party shall undertake to prevent in any territory under its jurisdiction other acts of cruel, inhuman or degrading treatment or punishment *which do not amount to torture as defined in article 1*, when such acts are committed by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

CAT art. 16, 23 I.L.M. at 1031 (emphasis added). The prohibitions against returning persons to another State outlined in Article 3 do not apply to states that merely engage in these "other acts" of cruel, inhuman, or degrading treatment or punishment.

President Reagan signed the Convention on April 18, 1988, with the following reservation: "The Government of the United States of America reserves the right to communicate, upon ratification, such reservations, interpretive under-

standings, or declarations as are deemed necessary." Declarations and Reservations to Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *available at* http://untreaty.un.org/ENGLISH/bible/englishinternetbible/partI/chapterIV/treaty14 .asp#N11. Thereafter, President Reagan transmitted the Convention to the Senate for ratification with seventeen proposed reservations, understandings and declarations. The legislative history on the ratification of CAT is found in the Report of the Committee on Foreign Relations, S. Exec. Rep. No. 30, 101st Cong., 2d sess. (Aug. 30, 1990) (hereinafter "S. Exec. Rep. 101–30").

The Senate did not act on the treaty by the end of President Reagan's tenure as President. *See id.* at 7. In January 1990, President George H.W. Bush submitted a revised and reduced list of proposed conditions due to concerns raised by the human rights community, members of the Senate Committee on Foreign Relations and others about the reservations, understandings and declarations submitted by the Reagan Administration. *Id.* at 4. However, the George H.W. Bush Administration explicitly affirmed the Reagan Administration's view on the subject of reservations relating to the intent element of the definition of torture, stating: "Reflecting our consultations with various interested groups in the private sector, the package now contains a

revised understanding to the definition of torture, which ... maintains our position that specific intent is required for torture." *Id.* at Appendix A, at 35 (Cover Letter on Bush Administration Reservations, Understandings, and Declarations, as Transmitted, from Janet G. Mullins, Assistant Secretary, Legislative Affairs, Department of State, to Senator Claiborne Pell, Chairman of the Senate Committee on Foreign Relations).[8] Accordingly, President George H.W. Bush's list of proposed conditions included a proposed understanding with respect to the definition of torture in Article 1 of CAT, which stated the "United States understands that, in order to constitute torture, an act must be *specifically intended* to inflict severe physical or mental pain or suffering." *Id.* at 9, 36 (emphasis added).

On October 27, 1990, the Senate adopted a resolution of advice and consent to ratification of CAT, subject to, among others things, the understanding proposed by President George H.W. Bush requiring specific intent for an act to constitute torture. *See generally* Senate Resolution of Advice and Consent to Ratification of CAT, 136 Cong. Rec. S17,486 (daily ed. Oct. 27, 1990) (hereinafter the "Senate Resolution"). The Senate Resolution stated as follows:

> That with reference to Article 1, the United States understands that, in order to constitute torture, an act must be

---

**8.** President Reagan's understanding—which was reproduced in the summary and analysis section of S. Exec. Rep. 101–30, at 11–28—stated, in relevant part, that the United States "understands that, in order to constitute torture, an act must be a deliberate and calculated act of an extremely cruel and inhuman nature, *specifically intended* to inflict excruciating and agonizing physical or mental pain or suffering." *See id.* at 15 (emphasis added). Furthermore, President Reagan's summary and analysis of the Convention stated:

> The requirement of intent is emphasized in Article 1 by reference to illustrate [*sic* ] motives for torture: obtaining information of a confession, intimidation and coercion, or any reason based on discrimination of any kind. The purposes given are not exhaustive, as is indicated by the phrasing "for such purposes as." Rather, they indicate the type of motivation that typically underlies torture, and emphasize the requirement for deliberate intention or malice.

*Id.* at 14. *See generally Auguste,* 395 F.3d at 131 & n. 5.

*specifically intended to inflict severe physical or mental pain or suffering* and that mental pain or suffering refers to prolonged mental harm caused by or resulting from: (1) the intentional infliction or threatened infliction of severe physical pain or suffering; (2) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality; (3) the threat of imminent death; or (4) the threat that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the sense or personality.

*See* Senate Resolution II(1)(a), 136 Cong. Rec. at S17,491 (emphasis added).

As explained in *Wang*, in order to implement CAT, Congress also enacted FARRA, which states in relevant part that

[i]t shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States.

FARRA § 2242(a); *see Wang*, 320 F.3d at 133. FARRA § 2242(b) directed the appropriate agency—the Department of Justice, in this case—to "prescribe regulations to implement the obligations of the United States under Article 3 of [CAT], subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention." FARRA § 2242(b). Accordingly, the Justice Department promulgated a series of implementing regulations

that, among other things, required the former INS (now BICE) to grant protection under CAT whenever it determines that an "alien is more likely than not to be tortured in the country of removal," 8 C.F.R. § 208.16(c)(4), though the "burden of proof is on the applicant for withholding of removal . . . to establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). *See generally Wang*, 320 F.3d at 133–34.

The Justice Department's implementing regulations for FARRA specifically incorporate the definition of "torture" from Article 1(1) of CAT, subject to "the reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention." 8 C.F.R. § 208.18(a); *see also* 8 C.F.R. § 208.18(a)(1) (incorporating, verbatim, the definition of torture from Article 1(1) of CAT). Torture is defined as "an extreme form of cruel and inhuman treatment." 8 C.F.R. § 208.18(a)(2). And as is particularly relevant here, the implementing regulations also adopted, verbatim, the language of the Senate Resolution of advice and consent to ratification of CAT: "In order to constitute torture, an act must be *specifically intended* to inflict severe physical or mental pain or suffering." 8 C.F.R. § 208.18(a)(5) (emphasis added).

■ In sum, to obtain relief from removal under CAT, FARRA and the Justice Department's implementing regulations, Mr. Thelemaque bore the burden of proving in the proceedings before the BIA that, if removed to Haiti, he would "more likely than not [ ] suffer intentionally-inflicted cruel and inhuman treatment that either (1) is not lawfully sanctioned by that country or (2) is lawfully sanctioned by that

country, but defeats the object and purpose of CAT." *Wang*, 320 F.3d at 130.[9]

## B.

In its decision on Mr. Thelemaque's appeal, the BIA determined that Mr. Thelemaque had not met this burden, expressly stating that "there is no evidence that the authorities intentionally and deliberately detain deportees in order to inflict torture." *In re Thelemaque*, attached to Respondents' Mem. of Law in Opp'n [3:04CV1727(MRK) (member) doc. # 6], at Ex. A, at 4. In reaching its decision, the BIA stated that, "like the Immigration Judge, we find that our prior decision in [*In re J–E–*, 23 I. & N. Dec. 291, 2002 WL 481156 (BIA 2002) (*en banc* ) ], is controlling in this matter." *In re Thelemaque*, attached to Respondents' Mem. of Law in Opp'n [3:04CV1727(MRK) (member) doc. # 6], at Ex. A, at 4. Because the BIA relied on its earlier decision in *In re J–E–*, applying that decision to the particular facts of Mr. Thelemaque's case, the Court will briefly review the basic holdings of *In re J–E–*.

In *In re J–E–*, the BIA considered "whether any actions by the Haitian authorities—indefinite detention, inhuman prison conditions, and police mistreatment—constitute torturous acts" as the term is defined under CAT and the implementing regulations. *In re J–E–*, 23 I. & N. Dec. at 292 (citing 8 C.F.R. § 208.18(a)). In its decision, the BIA defined torture as follows:

> For an act to constitute torture it must be: (1) an act causing severe physical or

mental pain or suffering; (2) intentionally inflicted; (3) for a proscribed purpose; (4) by or at the instigation of or with the consent or acquiescence of a public official who has custody or physical control of the victim; and (5) not arising from lawful sanctions.

*In re J–E–*, 23 I. & N. Dec. at 297 (citing 8 C.F.R. § 208.18(a)). And in considering whether an alien has satisfied his burden of proof as to whether it is more likely than not that he would be tortured in the proposed country of removal, the BIA stated that:

> all evidence relevant to the possibility of future torture shall be considered, including, but not limited to: (1) evidence of past torture inflicted upon the applicant; (2) evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured; (3) evidence of gross, flagrant, or mass violations of human rights within the country of removal, where applicable; and (4) other relevant information regarding conditions in the country of removal.

*In re J–E–*, 23 I. & N. Dec. at 303 (citing 8 C.F.R. § 208.16(c)(3)).

The BIA (*en banc*, though divided) reached a number of conclusions in *In re J–E–* that are relevant to his case. First, the BIA concluded that Haiti's policy of indefinite detention, standing alone, did not constitute torture because it was

> a lawful enforcement sanction designed by the Haitian Ministry of Justice to protect the populace from criminal acts

---

9. As the Second Circuit has further explained, [a] CAT claim focuses solely on the likelihood that the alien will be tortured if returned to his or her home country, regardless of the alien's subjective fears of persecution or his or her past experiences. [A] CAT claim lacks a subjective element, focuses broadly on torture without regard

for the reasons for that treatment, and requires a showing with respect to future, rather than past, treatment.
*Ramsameachire v. Ashcroft*, 357 F.3d 169, 185 (2d Cir.2004) (citing 8 C.F.R. §§ 208.16(c)(3) & 208.16(c)(4); *Wang*, 320 F.3d at 144 & n. 20).

committed by Haitians who are forced to return to the country after having been convicted of crimes abroad.... Although this practice is unacceptable and must be discontinued, there is no evidence that Haitian authorities are detaining criminal deportees with the specific intent to inflict severe physical or mental pain or suffering. Nor is there any evidence that Haiti's detention procedure is inflicted on criminal deportees for a proscribed purpose, such as obtaining information or a confession; punishment for a victim's or another's act; intimidating or coercing a victim or another; or any discriminatory purpose.

*In re J–E–*, 23 I. & N. Dec. at 300 (citing 8 C.F.R. §§ 208.18(a)(5) & 208.18(a)(1)).

Second, the BIA determined that the deplorable conditions of Haiti's prisons— even when coupled with the possibility of indefinite detention—did not constitute torture because "there is no evidence that [Haitian authorities] are intentionally and deliberately creating and maintaining such prison conditions in order to inflict torture.... [Rather,] Haitian prison conditions are the result of budgetary and management problems as well as the country's severe economic difficulties." *Id.* at 301.

Third, the BIA found that while there had been isolated instances of police mistreatment in prisons—some of which "may constitute acts of torture"—the alien in *In re J–E–* had failed to establish that either his personal history made it more likely than not that he would be tortured, or that the instances of police mistreatment of prisoners was "so pervasive as to establish a probability that a person detained in a Haitian prison will be subject to torture, as opposed to other acts of cruel, inhuman, or degrading punishment or treatment." *Id.* at 302–04. *See generally Auguste,* 395 F.3d at 135–36.

The arguments presented by Mr. Thelemaque are virtually identical to those advanced in *In re J–E–:* He argues that the BIA erred in concluding that the conditions under which he would be imprisoned in Haiti do not constitute torture, and he describes those conditions (in language reminiscent of *In re J–E–*) as consisting of a "life-threatening lack of food and medical supplies, lack of basic sanitation, contaminated water, severe overcrowding, extreme heat, lack of light or ventilation, infestation with vermin, and the likelihood of severe physical abuse." Petition [3:04CV676(MRK) (lead) doc. # 1], at ¶ 19. However, nowhere in the record before the Court does Mr. Thelemaque assert that the conditions in the Haitian prisons and/or the prevalence of mistreatment of prisoners by the Haitian police have changed for the worse since the BIA's decision in *In re J–E–.* Nor does Mr. Thelemaque present evidence that he ever personally was a victim of torture in Haiti, or that he, his family, or close associates hold certain personal, religious, or political beliefs or have engaged in activities that would make him more susceptible to torture at the hands of Haitian authorities. Without additional evidence of this sort, it is clear that Mr. Thelemaque's arguments are no different from those advanced in *In re J–E–.* And, for the reasons stated below, they fare no better.

The closest Mr. Thelemaque comes to a novel argument is his apparent attempt to distinguish his case from *In re J–E–* by focusing on an alleged October 2002 Haitian policy regarding returnees, which according to Mr. Thelemaque, makes it a certainty that he will be detained indefinitely in a Haitian prison, because he has no close relatives in Haiti. *See* Petition [3:04CV676(MRK) (lead) doc. # 1], at ¶¶ 11–12; *see also* Part I, *supra.* Mr. Thelemaque essentially argues that the BIA was well aware of this alleged new

policy, yet still found that deporting him to Haiti would not constitute torture, and that this finding is an erroneous application of the relevant law. Though Mr. Thelemaque asserts that this October 2002 policy was part of the record evidence in the proceedings below, see *id.*, he does not offer documentary support for his assertion. Furthermore, Respondents dispute the existence of any such policy, and offer the declaration of John F. O'Malley, BICE's Headquarters Office of Detention and Removal Operations liaison to the United States Department of State, who states that Haiti will "detain criminal Haitian upon their return for approximately two to three months," and that "returnees will only be detained while Haiti investigates their background and their support system in Haiti." *See* Declaration of John F. O'Malley, attached to Respondents' Mem. of Law in Opp'n [3:04CV1727(MRK) (member) doc. # 6], at Ex. C at ¶¶ 3–4.

It is unnecessary for the Court to resolve this dispute, because even assuming Mr. Thelemaque is correct about the alleged new policy, that would not constitute a meaningful distinction from the facts and arguments presented in *In re J–E–*, which specifically stated that the alien in that case had claimed that he would be "indefinitely detained by the Haitian authorities." *In re J–E–*, 23 I. & N. Dec. at 299. Because Mr. Thelemaque does not present additional facts that markedly distinguish his case from *In re J–E–*, the Court's task in this case is to review the BIA's interpretation of statutory and regulatory law in *In re J–E–* and the BIA's application of that law to Mr. Thelemaque's case.

## C.

On the record before the Court, the Court sees no reason—either on *de novo* or a more deferential review—to conclude that the BIA erroneously interpreted the statutes and regulations governing CAT relief in *In re J–E–* or erroneously applied that statutory and regulatory law to the particular facts of Mr. Thelemaque's case. The possibility of indefinite detention, the generally squalid conditions of Haitian prisons, and general allegations of sporadic instances of torture by police officers—standing alone—are insufficient to establish that Mr. Thelemaque is more likely than not to be tortured upon his removal to Haiti.

### 1.

Focusing first solely on Haiti's alleged indefinite detention policy for criminal returnees, as stated earlier, the BIA in *In re J–E–* found that Haiti's policy has a legitimate purpose of immigration control and public safety, and that as a lawful government sanction, the policy does not defeat the purpose of CAT and cannot, by itself, be considered torture. *In re J–E–*, 23 I. & N. Dec. at 300. The Eleventh Circuit agrees with the BIA. *See Cadet*, 377 F.3d at 1193 ("As stated in the BIA's decision in [*In re J–E–*], Haiti's detention policy does not constitute CAT-prohibited 'torture' because it is implemented for a legitimate purpose, rather than to inflict pain and suffering for a proscribed purpose, and because it constitutes a lawful sanction. Because the BIA's conclusions ... are reasonable interpretations of the immigration laws and regulations defining 'torture,' we, like the district court, defer to them.") (citing *In re J–E–*, 23 I. & N. Dec. at 300). However, the Third Circuit in *Auguste v. Ridge, supra,* questioned whether indefinite detention could be considered a lawful sanction under either the Haitian Constitution or international human rights law, which prohibit indefinite and arbitrary confinement. *See Auguste*, 395 F.3d at 152-53. To date, the Second Circuit has not had occasion to rule definitively on this issue, though the Court notes that in

*Khouzam v. Ashcroft*, 361 F.3d 161 (2d Cir.2004), the Second Circuit used rather strong language to condemn the BIA's broad application of the "lawful government sanction" portions of *In re J–E–* as "patently erroneous" because it would "totally eviscerate the CAT." *Id.* at 169.

Like the Third Circuit in *Auguste*, this Court need not resolve this issue because *In re J–E–* included an alternative ground for finding that even indefinite detention in Haitian prisons does not constitute torture within the meaning of CAT—namely, there has been no showing that Haitian authorities are detaining criminal returnees with the intent of inflicting severe physical or mental pain and suffering upon them. This requirement of a showing of intent to inflict pain or suffering before an act may be considered torture follows directly from the text of CAT itself, as well as from the United States' express reservations to the Convention, Congress' enactment of FAR-RA and the Justice Department's implementing regulations. *See* Part III.A, *supra.* As a result, the Second Circuit in *Wang* explained that CAT required proof of "*intentionally-inflicted* cruel and inhuman treatment." *Wang*, 320 F.3d at 134 (emphasis added). And the Second Circuit distilled the definition of torture under the CAT as follows: "Torture is defined as the *intentional infliction* of pain or suffering that is perpetrated or sanctioned by a nation's authorities." *Ramsameachire v. Ashcroft*, 357 F.3d 169, 184 (2d Cir.2004)

(emphasis added) (citing *Wang*, 320 F.3d at 134).

The Court recognizes that a heated debate has developed in courts and beyond regarding whether CAT requires a showing of "specific intent" to inflict severe pain and suffering or only a showing of "general intent." [10] The majority opinion in *In re J–E–* explicitly stated that torture requires a "*specific intent* to inflict severe physical or mental pain or suffering," *In re J–E–*, 23 I. & N. Dec. at 300 (emphasis added), citing the understanding contained in Senate Resolution II(1)(a), 136 Cong. Rec. at S17,491, and citing S. Exec. Rep. 101–30, at 13–14. The *In re J–E–* majority opinion further stated that "[a]lthough Haitian authorities are intentionally detaining criminal deportees knowing that the detention facilities are substandard, there is no evidence that they are intentionally and deliberately creating and maintaining such prison conditions in order to inflict torture." *In re J–E–*, 23 I. & N. Dec. at 301.

These statements, among others, sparked two separate dissents, each joined by the same seven BIA board members. Board Member Lory Diana Rosenberg's dissent directly addressed the issue of specific intent, stating

> [t]he majority's reading of the regulations functionally converts the Senate understanding that torture must be specifically intended into a "specific intent" requirement. I disagree. I can find no

---

**10.** In the American criminal law context, the Supreme Court recently offered the following factual scenario in the context of the federal bank robbery statute, 18 U.S.C. § 2113(a), to help illustrate the differences between general and specific intent:

> [A] person entered a bank and took money from a teller at gunpoint, but deliberately failed to make a quick getaway from the bank in the hope of being arrested so that he would be returned to prison and treated

for alcoholism. Though this defendant knowingly engaged in the acts of using force and taking money (satisfying "general intent"), he did not intend permanently to deprive the bank of its possession of the money (failing to satisfy "specific intent"). *Carter v. United States*, 530 U.S. 255, 268, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000); *see also United States v. Sewell*, 252 F.3d 647, 650 (2d Cir.2001).

basis to conclude that the Senate understanding was intended to require proof of an intent to accomplish a precise criminal act, as the majority contends is required. Rather, the plain language of the text of 8 C.F.R. § 208.18(a)(5) reflects only that something more than an accidental consequence is necessary to establish the probability of torture.

*In re J–E–*, 23 I. & N. Dec. at 316 (Rosenberg, dissenting) (internal citation omitted).

The Third Circuit in *Zubeda v. Ashcroft*, 333 F.3d 463 (3d Cir.2003), also questioned whether the regulations implementing FARRA and the BIA's decision in *In re J–E–* appropriately imposed a "specific intent" requirement prior to finding certain actions constitute torture. Specifically, *Zubeda* stated that "[a]lthough the regulations require that severe pain or suffering be intentionally inflicted, we do not interpret this as a 'specific intent' requirement. Rather, we conclude that [CAT] simply excludes severe pain or suffering that is the unintended consequence of an intentional act." *Id.* at 473 (internal quotations and citations omitted). The court in *Zubeda* based its decision on the structure of the regulations as a whole, for instance noting that the "specifically intended" language in 8 C.F.R. § 208.18(a)(5) is immediately qualified and explained by the statement "[a]n act that results in unanticipated or unintended severity of pain and suffering is not torture." *Id.; see Zubeda*, 333 F.3d at 473. *Zubeda* interpreted this regulation as distinguishing "between suffering that is the accidental result of an intended act, and suffering that is purposefully inflicted or the forseeable consequence of deliberate conduct," concluding that "this is not the same as requiring a specific intent to inflict suffering." *Id.* *Zubeda* ultimately warned that "requiring an alien to establish the specific intent of his/her persecutors could impose insur-

mountable obstacles to affording the very protections the community of nations sought to guarantee under the Convention Against Torture." *Id.* at 474.

However, the more recent Third Circuit opinion in *Auguste v. Ridge, supra,* held that there was, in fact, a specific intent requirement in FARRA and the implementing regulations, which was properly applied by the BIA in *In re J–E–*. *See Auguste*, 395 F.3d at 139–47. After engaging in a thorough review of the text and legislative history of CAT, FARRA, and the implementing regulations (from which this Court drew in Part III.A, *supra* ), the court in *Auguste* stated as follows:

> [I]n the context of [CAT], for an act to constitute torture, there must be a showing that the actor had the intent to commit the act as well as the intent to achieve the consequences of the act, namely the infliction of the severe pain and suffering. In contrast, if the actor intended the act but did not intend the consequences of the act … although such pain and suffering may have been a foreseeable consequence, the specific intent standard would not be satisfied.

*Auguste*, 395 F.3d at 145–46. *Auguste* further explained that

> [t]he mere fact that the Haitian authorities have knowledge that severe pain and suffering may result by placing detainees in these conditions does not support a finding that the Haitian authorities intend to inflict severe pain and suffering. The difference goes to the heart of the distinction between general and specific intent.

*Auguste*, 395 F.3d at 153–54. In so holding, *Auguste* declined to follow the specific intent portions of *Zubeda*, denominating

them as *dicta. Id.* at 148.[11]

That said, *Auguste* did recognize that *In re J–E–* should not be read to impose a "heightened strict intent" or a "specific intent plus" standard, and that 8 C.F.R. 208.18(a)(5) should be read only to require that "the act be specifically intended to inflict severe pain and suffering, not that the actor intended to commit torture." *Auguste,* 395 F.3d at 146. In essence, according to *Auguste*'s interpretation of CAT, FARRA, and the implementing regulations, an alien seeking CAT relief need not show that Haiti specifically intends to torture him. However, the alien must show that Haitian authorities specifically intend to inflict severe pain and suffering on him through deliberately creating and/or maintaining deplorable prison conditions. *Auguste,* 395 F.3d at 145–46, 153–54.

Though they did not expressly address the subject of specific versus general intent, the First Circuit in *Elien v. Ashcroft,* 364 F.3d 392 (1st Cir.2004), and the Eleventh Circuit in *Cadet v. Bulger, supra,* have generally approved of the holding in *In re J–E–* in the context of claims by Haitian returnees for relief under CAT. *See Cadet,* 377 F.3d at 1192–95; *Elien,* 364 F.3d at 398–99. Furthermore, both *Cadet* and *Elien* cited the Justice Department's implementing regulations that mirror the original language of Article 1(1) of CAT, stating that torture must be "intentionally inflicted." *Cadet,* 377 F.3d at 1180 (quoting 8 C.F.R. § 208.18(a)(1)); *Elien,* 364 F.3d at 398 (same). In passing, *Cadet* also mentioned 8 C.F.R. § 208.18(a)(5), which includes the "specifically intended" language. *See Cadet,* 377 F.3d at 1181.

The Second Circuit also has not addressed whether general or specific intent is required in its recent CAT decisions—

*Wang v. Ashcroft, Ramsameachire v. Ashcroft,* and *Khouzam v. Ashcroft, supra.* However, in *Khouzam,* an opinion highly critical of the BIA's attempt to use *In re J–E–* to justify its about-face on whether routinely employed interrogation techniques by Egyptian police and prison officials constituted torture, the Second Circuit did state that "[i]n terms of state action, torture requires only that government officials know of or remain willfully blind to an act and thereafter breach their legal responsibility to prevent it." *Khouzam,* 361 F.3d at 171. And *Wang* and *Ramsameachire* each indicate that CAT requires proof of "intentionally-inflicted" pain or suffering. *Wang,* 320 F.3d at 134; *see Ramsameachire,* 357 F.3d at 184 ("Torture is defined as the intentional infliction of pain or suffering . . .").

■ A review of the language and legislative history of CAT, FARRA, and the implementing regulations in Part III.A, *supra,* persuades the Court that the United States has interpreted the definition of torture under CAT to contain a requirement of specific intent—that is, CAT, as interpreted by the United States, requires a showing of a specific intent to inflict severe pain and suffering (though not a specific intent to inflict torture). First, Article 1(1) of CAT itself defines torture as an intentional act. The Reagan and George H.W. Bush Administrations each transmitted CAT to the Senate with the clear understanding that the definition of torture contained a specific intent component. *See* S. Exec. Rep. 101–30, at 9, 35, 36. And the Senate, through the advice and consent process for ratification of CAT, affirmed and explicitly incorporated this clear understanding. *See* Senate Resolution II(1)(a), 136 Cong. Rec. at S17491.

---

11. On March 3, 2005, Mr. Auguste filed a petition for a rehearing *en banc* seeking to resolve what he termed a split within the Third Circuit.

Finally, FARRA charged the Justice Department with drafting implementing regulations that incorporated that understanding, see FARRA § 2242(b), and the Justice Department did so in 8 C.F.R. § 208.18(a)(5), which unambiguously states: "In order to constitute torture, an act must be *specifically intended* to inflict severe physical or mental pain or suffering." 8 C.F.R. § 208.18(a)(5) (emphasis added). Thus, the Court generally agrees with the Third Circuit's ultimate conclusion in *Auguste* that an alien seeking CAT relief based solely on indefinite detention in the deplorable prison conditions of Haiti must show that the Haitian authorities specifically intended to inflict cruel and inhuman treatment on returnees by deliberately maintaining such conditions.

■ *In re J–E–* applied the above-cited provisions and found that the atrocious prison conditions in Haiti are a reflection of the pervasive poverty and lack of adequate government institutions to manage the prison system—and thus are not specifically intended for the purpose of inflicting cruel and inhuman treatment on returnees. *In re J–E–*, 23 I. & N. Dec. at 300–01. Likewise, Mr. Thelemaque may have established that the Haitian government intentionally detains criminal returnees in its prisons indefinitely, but he has not shown that the abysmal conditions of Haitian prisons are anything other than the "unintended consequence of budgetary and management problems as well as the country's severe economic difficulties." *Francois v. Ashcroft*, 343 F.Supp.2d 327, 337 (D.N.J.2004) (internal quotations omitted). In short, there is a difference between being impoverished and being cruel, and CAT's prohibition on returning persons to another State was expressly intended to deal with the latter, not the former. *See Cadet*, 377 F.3d at 1190 ("CAT itself expressly differentiates between 'torture' and

'other acts of cruel, inhuman or degrading treatment or punishment.' Only those acts that amount to a likelihood of 'torture' under Article 1 trigger CAT's and FARRA's requirement that an individual's return to the suspect country be suspended.") (citing *In re J–E–*, 23 I. & N. Dec. at 295–96 ("Notably, the protection afforded under Article 3 extends only to acts of torture as defined in Article 1 of the Convention.")). Therefore, as brutal and horrid as Haitian prison conditions may be and as much as this Court may deplore those conditions, they have not been shown on this record to constitute torture within the meaning of the Convention. *See Auguste*, 395 F.3d at 152–53.

■ The Court hastens to add that nothing in this opinion should be understood as condoning brutal prison conditions or adopting a *per se* rule that horrific prison conditions can never constitute torture. The Court explicitly does not do so. Nor has the Court sought in this case to delineate fully the precise contours of the specific intent requirement of CAT. The Court recognizes that a mechanical application of the specific intent requirement might yield results at odds with the language and intent of CAT and that concepts such as deliberate indifference, reckless disregard or willful blindness might well suffice in certain circumstances to satisfy the specific intent requirement of the Convention. Therefore, both the BIA and this Court must always remain attentive to Congress' underlying purposes in ratifying the Convention and to the particular facts presented by each person seeking relief under it. *See, e.g., Khouzam*, 361 F.3d at 169–70 (reprimanding the BIA for failing to adhere to Congress' clearly expressed purpose in ratifying CAT); *Ramsameachire*, 357 F.3d at 185 (reprimanding the BIA for failing to consider all proffered

evidence before rejecting an alien's CAT claim).

On the record before the Court, however, there is no evidence of gross and deliberate indifference to the indecent conditions in Haitian prisons. Indeed, it appears from the recent State Department Country Reports on Human Rights Practices that Haiti has actively engaged in efforts to improve its prison conditions, in cooperation with local and international non-governmental organizations. *See State Department Country Report— Haiti 2004*, at *4. For instance, the United Nations Development Program is providing technical assistance to Haiti's Department of Prison Administration (DAP) for training of wardens and information management; the National Coalition for Haitian Rights, a local human rights organization, is actively monitoring prison conditions in cooperation with DAP; and the Haitian authorities freely permit the International Committee of the Red Cross, the Haitian Red Cross, and other human rights groups to enter prisons, monitor conditions, and assist prisoners and detainees with medical care, food, and legal aid. *See id.; see also In re J– E–*, 23 I. & N. Dec. at 301 (noting similar efforts to improve prison conditions and allow monitoring). Though there is clearly much more work to be done, Haiti appears to be demonstrating some effort to improve its prisons with the limited resources that impoverished nation has at its disposal, thus countering any suggestion that Haitian authorities are deliberately creating and maintaining horrific prison conditions with the specific intent of inflict severe pain and suffering on criminal returnees such as Mr. Thelemaque.

**2.**

■ Finally, the Court must address Mr. Thelemaque's allegations that Haitian officials have intentionally inflicted torture on prisoners in Haitian jails. To be sure, there is general evidence of sporadic physical abuse by police of criminal returnees that does, in fact, meet the definition of torture under CAT as interpreted by the United States. *See* U.S. State Department, Bureau of Democracy, Human Rights, and Labor, *Country Report on Human Rights Practices—Haiti 2003*, at *4 (Feb. 25, 2004), *available at http:// www.state.gov/g/drl/rls/hrrpt/2003/27902. htm* ("Police mistreatment of suspects at the time of arrest and during detention remained common in all parts of the country. Beating with fists, sticks, belts, and 'kalot marassa'—a severe boxing of the ears—were the most common form of abuse. Persons who reported such abuse often had visible injuries consistent with the alleged mistreatment. Mistreatment also took the form of withholding medical treatment from injured jail inmates."). Furthermore, *In re J–E–* acknowledged that "there are isolated instances of mistreatment in Haitian prisons that rise to the level of torture within the meaning of 8 C.F.R. § 208.18(a)." *In re J–E–*, 23 I. & N. Dec. at 302.

But that does not mean that it is more likely than not that Mr. Thelemaque will be subject to such abuse. Most courts considering CAT claims follow the approach of *In re J–E–* and require a showing that either the alien in question was himself subject to torture in past or that torture is pervasive and widespread. *See, e.g., Auguste*, 395 F.3d at 154 ("[A]lthough there were reported instances of beatings of prisoners, the alien had failed to show that the beatings were 'so pervasive as to establish a probability that a person detained in a Haitian prison will be subject to torture.' ") (quoting *In re J–E–*, 23 I. & N. Dec. at 304); *Elien*, 364 F.3d at 398–99 ("[A] Haitian national failed to meet his

burden of proof by simply adducing anecdotal evidence of 'isolated acts of torture' in Haiti's detention facilities, such as burning with cigarettes and electric shock, and no record evidence was adduced that Haiti used torture pervasively or as a matter of policy on detainees.") (quoting *In re J–E–*, 23 I. & N. Dec. at 303); *Khouzam*, 361 F.3d at 170 (2d Cir.2004) (noting that "the [*In re J–E–*] respondent had failed to show that the torture was 'pervasive and widespread'") (quoting *In re J–E–*, 23 I. & N. Dec. at 304); *Wang*, 320 F.3d at 144 (alien "failed to establish that his alleged previous beating was anything more than a deviant practice carried out by one rogue military official"); *Francois*, 343 F.Supp.2d at 334 ("in order to succeed under *Matter of J–E–*, petitioner must show more than inhumane prison conditions and isolated instance of torture"). This Court agrees that, in the absence of any evidence that a particular Haitian alien's background or history with torture makes future torture more likely, an alien must show that torture is pervasive and widespread in Haitian jails. From the record before the Court, Mr. Thelemaque has failed to make that showing in this case. *Cf. Zubeda*, 333 F.3d at 477 (contrasting the conditions in Haiti as described in *In re J–E–* with the conditions in the Congo, stating "this record is replete with reports from government agencies and human rights organizations that detail what appear to be country wide, systematic incidents of gang rape, mutilation, and mass murder [in the Congo]."). At best, he has provided evidence of sporadic and isolated instances of torture and that does not satisfy his burden under FARRA and its implementing regulations. *See Auguste*, 395 F.3d at 154; *Elien*, 364 F.3d at 398–99; *Khouzam*, 361 F.3d at 170; *Wang*, 320 F.3d at 144.

**D.**

From the foregoing, it is apparent that in rejecting Mr. Thelemaque's CAT claim, the BIA neither erroneously interpreted the statutes and regulations governing CAT relief nor erroneously applied the statutory and regulatory law developed in *In re J–E–* to the facts presented by Mr. Thelemaque (which are basically indistinguishable from *In re J–E–*). This Court's conclusion is bolstered by the fact that all other courts facing CAT claims by Haitian aliens have upheld the basic reasoning of *In re J–E–* and arrived at the same conclusions as this Court.

For instance, the Eleventh Circuit in *Cadet v. Bulger, supra*, concluded that "[b]ecause the BIA's conclusions in [*In re J–E–*] are reasonable interpretations of the immigration laws and regulations defining 'torture,' we, like the district court, defer to them and conclude that Haiti's indefinite detention of criminal deportees by itself does not constitute 'torture' as defined under CAT." *Cadet*, 377 F.3d at 1193. *Cadet* further stated that

the conditions of Haiti's prisons qualify as "cruel, inhuman and degrading" under CAT. Indeed, in other contexts and under other definitions they might be described as torturous. The fact remains, however, that the only relevant definition of "torture" is the definition contained in CAT and its implementing regulations. The definition in CAT draws a critical distinction between "torture" and "other acts of cruel, inhuman, or degrading punishment or treatment." CAT, arts. 1, 16. Accordingly, we conclude that the district court did not err in its deference to the BIA's legal conclusion that Haitian prison conditions do not rise to the level of CAT-prohibited "torture."

*Id.* at 1194.

Similarly, the Third Circuit in *Auguste v. Ridge, supra*, held:

Keeping in mind the appropriate deference we must give to the BIA in the interpretation of its own regulations, we do not think the BIA acted outside of its authority or contrary to law in *Matter of J–E–* in concluding that the Haitian authorities lack the requisite specific intent to inflict severe pain and suffering on Auguste, or others like him, within the meaning of 8 C.F.R. § 208.18(a)(5).

*Auguste,* 395 F.3d at 153. The First Circuit in *Elien v. Ashcroft, supra,* reached the same result, stressing that a Haitian alien's CAT claim fails when he makes "no attempt ... to demonstrate in what respect his proffer is qualitatively different than or superior to the *In re J–E–* record" and does not "make a proffer before the BIA which would permit a finding by an [immigration judge] that torture of detainees was widespread in Haiti." *Elien,* 364 F.3d at 399. The District of New Jersey in *Francois v. Ashcroft, supra,* recently reached a similar conclusion, stating that "[s]ince petitioner has presented no evidence that Haitian prisoners are treated any worse than they were when *Matter of J–E* was decided, under *Matter of J–E–,* his petition must be denied." *Francois,* 343 F.Supp.2d at 337. *See also Mompoint v. INS,* No. 3:03CV346(WWE), 2003 WL 22953080, at *1 (D.Conn. Dec.3, 2003) (finding no evidence that the petitioner would be intentionally tortured by government officials upon return to Haiti, though without discussing *In re J–E–*); *Julmiste v. Ashcroft,* 212 F.Supp.2d 341, 348 (D.N.J. 2002) (same).

The Court emphasizes that had Mr. Thelemaque demonstrated that the conditions in Haiti's prisons have significantly changed since the BIA's decision in *In re J–E–* such that it is necessary for the BIA to reconsider the factual underpinnings of that decision, the Court would remand this case for such a determination. *See generally In re Thelemaque,* attached to Respondents' Mem. of Law in Opp'n [3:04CV1727(MRK) (member) doc. # 6], at Ex. A, at 4 ("[W]e decline to revisit our decision in [*In re J–E–*] ... inasmuch as the respondent has failed to establish that conditions in Haiti have changed such that it is necessary to reconsider our previous decision.").[12] Furthermore, if the Court believed that the BIA had blindly or reflexively relied on *In re J–E–* without careful consideration of the specific facts presented by Mr. Thelemaque or any changed conditions he might have proved, the Court would remand for reconsideration. *See Kay v. Ashcroft,* 387 F.3d 664, 674–75 (7th Cir. 2004) (stating that the BIA's decision to deny an alien relief under CAT with respect to removal to Burma was "made without a rational explanation," severely criticizing the BIA's reliance on *In re J–E–* which was factually distinguishable based on the alien's personal history with torture and the copious evidence of gross, flagrant, and mass violations of human rights in Burma) (internal quotations and citations omitted); *Khouzam,* 361 F.3d at 169–70 (finding that an alien seeking CAT relief would more likely than not be detained and tortured by the police if removed to Egypt based on copious evidence of pervasive and systematic torture of returnees to Egypt, reversing a BIA decision that erroneously applied *In re J–E–*); *Zubeda,* 333 F.3d at 475–78 (finding that an alien seeking CAT relief would

12. The Court notes in passing that conditions can and do sometimes change for the worse, as evident in Mr. Thelemaque's case where his removal was suspended for a period of seven months because BICE determined that the political conditions in Haiti warranted the suspension of *all* deportations. *See* Stipulation and Order [3:04CV676(MRK) (lead) doc. # 9].

more likely than not be raped and subject to other atrocities constituting torture if removed to the Congo based on copious evidence of gross, flagrant, and mass violations of human rights in that country, reversing a BIA decision that erroneously applied *In re J–E–*). *Cf. Ramsameachire*, 357 F.3d at 185 (remanding to the BIA to reconsider a Sri Lankan alien's CAT claim for failure to consider all proffered evidence before rejecting his claim); *Al-Saher v. INS*, 268 F.3d 1143, 1146–48 (9th Cir.2001) (a pre-*In re J–E–* case finding an Iraqi national eligible for protection under CAT where he established that he was likely to be detained by Iraqi authorities, and the record indicated that the security services routinely tortured detainees and that Iraqi refugees often reported instances of torture).

But Mr. Thelemaque has failed to provide any evidence of a change in the prison conditions of Haiti. Nor has he demonstrated that the BIA ignored the specific facts of his case. As a consequence, the Court DENIES Mr. Thelemaque's habeas petition in 3:04CV676(MRK) (lead) [doc. # 1] because he has failed to demonstrate that the BIA erroneously interpreted or applied CAT, FARRA and/or the corresponding Department of Justice regulations implementing FARRA when it concluded that removing Mr. Thelemaque to Haiti would not constitute torture. In view of that ruling, the Court DENIES AS MOOT Mr. Thelemaque's Motion for a Temporary Restraining Order [doc. # 6] seeking to prevent the removal of Mr. Thelemaque pending the Court's disposition of his habeas petition. However, if Mr. Thelemaque wishes to preserve his right to take an appeal to the Second Circuit, the Court will stay his removal pending his appeal if he explicitly requests such a stay (though the Court notes that it is not entirely clear that Mr. Thelemaque actually wants a stay, in view of his *Zadvydas* claim discussed in Part IV, *infra* ).

## IV.

█ Turning next to Mr. Thelemaque's second habeas petition [3:04CV1727(MRK) (member) doc. # 1], the Court notes at the outset, as it had occasion to emphasize recently in another case, that a "self-inflicted wound cannot be grounds for [a] *Zadvydas* claim." *Abimbola v. Ridge*, No. 3:04CV856 (MRK), 2005 WL 588769, at *2 (D.Conn. Mar.7, 2005); *see, e.g., Guang v. INS*, No. CV025916(DGT), 2005 WL 465436, at *2 (E.D.N.Y. Feb.28, 2005) (denying *Zadvydas* claim where "petitioner's own actions—not the government's inability to deport him—have resulted in his continued detention during the past five years, during which time he has filed motions and/or appeals with the administrative courts, Second Circuit, and district court, with corresponding requests for stays of removal."). Thus, Mr. Thelemaque's own actions in seeking further judicial review of his CAT claims do not give him grounds to complain that his removal is not reasonably possible within the meaning and intent of *Zadvydas*. *See Zadvydas*, 533 U.S. at 701, 121 S.Ct. 2491 (petitioner must "provide[ ] good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future"). Furthermore, because the Court denies Mr. Thelemaque's habeas petition based upon his CAT claim above, his "removal is not merely reasonably foreseeable, it is imminent." *Wang*, 320 F.3d at 146. Therefore, Mr. Thelemaque's continued detention does not violate his right to due process of law, see *id.,* and his *Zadvydas* claim fails. Mr. Thelemaque's habeas petition 3:04CV1727(MRK) (member) [doc. # 1] is DENIED.

## V.

■ Still pending before the Court is Mr. Thelemaque's Motion to Amend his Petition for Writ of Habeas Corpus [3:04CV676(MRK) (lead) doc. # 19], which Respondents oppose. *See generally* Respondents' Opp'n to Mot. to Amend [doc. # 21]. As mentioned in Note 6, *supra,* Mr. Thelemaque is currently challenging an October 27, 1994 narcotics conviction by means of a habeas petition in the Connecticut state courts. In his motion to amend, Mr. Thelemaque apparently either requests that this Court stay his deportation pending the resolution of his state habeas proceedings, or seeks to collaterally attack his October 27, 1994 narcotics conviction through his habeas petition in this Court. In either case, Mr. Thelemaque's proposed amendment would be futile, and as a consequence, the Court denies his motion to amend. *See, e.g., Ellis v. Chao,* 336 F.3d 114, 127 (2d Cir.2003) ("[I]t is well established that leave to amend a complaint need not be granted when amendment would be futile.") (citing *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)); *Jones v. New York State Div. of Military & Naval Affairs,* 166 F.3d 45, 50 (2d Cir.1999) ("a district court may properly deny leave when amendment would be futile"); *Campos–Javier v. Ashcroft,* No. 04CV908(RO), 2004 WL 2423785, at *1 (S.D.N.Y. Oct.29, 2004) ("Leave to amend a pleading should be granted where 'justice so requires,' but is not warranted where the purported amendment would be futile.") (quoting Fed.R.Civ.P. 15(a)).

■ The fact that Mr. Thelemaque has a state habeas "collateral attack on the conviction supporting his removal pending does not provide a basis for staying BICE enforcement of the immigration laws." *Talbot v. Ashcroft,* No. 3:04CV653(JBA), 2004 WL 885194, at *1 (D.Conn. Apr.23, 2004). Even if his October 27, 1994 state narcot-

ics conviction were the sole basis for removal, "[u]ntil [an alien] has overturned his conviction in a collateral action against the state, [BICE] may rely on it as a lawful basis for detention and deportation." *Contreras v. Schiltgen,* 122 F.3d 30, 33 (9th Cir.1997), *affirmed on reargument,* 151 F.3d 906 (9th Cir.1998) (quoted in *Talbot,* 2004 WL 885194, at *1); *see Montilla v. INS,* 926 F.2d 162, 164 (2d Cir. 1991) ("drug conviction is considered final and a basis for deportation when appellate review of the judgment—not including collateral attacks—has become final") (citing *Marino v. INS,* 537 F.2d 686, 691–92 (2d Cir.1976)); *McKenzie v. Dep't of Homeland Sec.,* No. 3:04CV67(JBA), 2004 WL 885181, at *2 (D.Conn. Apr.23, 2004) (A "conviction is presumptively valid and may be used by the immigration authorities as a basis for an order of removal until set aside on direct or collateral review.") (internal citations omitted). *Cf. Daniels v. United States,* 532 U.S. 374, 382, 121 S.Ct. 1578, 149 L.Ed.2d 590 (2001) ("[I]f, by the time of sentencing under the [Armed Career Criminals Act], a prior conviction has not been set aside on direct or collateral review, that conviction is presumptively valid and may be used to enhance the federal sentence.") (citing *Custis v. United States,* 511 U.S. 485, 497, 114 S.Ct. 1732, 128 L.Ed.2d 517 (1994)).

■ Furthermore, even if his October 27, 1994 state narcotics conviction were the sole basis for removal, any attempt by Mr. Thelemaque to collaterally attack his state court conviction under 28 U.S.C. § 2241 would not be allowed. *See, e.g., Broomes v. Ashcroft,* 358 F.3d 1251, 1255 (10th Cir. 2004) ("[A] petitioner cannot collaterally attack an expired state court conviction under § 2241."); *Drakes v. INS,* 330 F.3d 600, 606 (3rd Cir.2003) (extending "the Supreme Court's holdings in [*Daniels v. United States,* 532 U.S. 374, 121 S.Ct.

1578, 149 L.Ed.2d 590 (2001) ] and [*Lackawanna County District Attorney v. Coss*, 532 U.S. 394, 121 S.Ct. 1567, 149 L.Ed.2d 608 (2001) ] to bar in a section 2241 habeas proceeding a collateral attack on a prior state conviction where the conviction serves as a predicate for an order of removal."); *Contreras*, 122 F.3d at 31–32 (a petitioner "may not collaterally attack his state court conviction in a habeas proceeding against the INS"); *McKenzie*, 2004 WL 885181, at *2 (a prior state conviction, "except in rare circumstances not applicable here, cannot be subject to collateral attack under 28 U.S.C. § 2241"); *Plummer v. Ashcroft*, 258 F.Supp.2d 43, 45–46 (D.Conn.2003) ("[G]iven the undisputed fact of a conviction, [a] § 2241 petition cannot be used to challenge [petitioner's] underlying state conviction, nor can [petitioner] litigate in this petition the consequences of any possible future determination of invalidity of the state conviction.").

Though both the fact that Mr. Thelemaque has no basis to stay his removal pending the outcome of the state habeas petition, and the fact that he cannot collaterally attack a state conviction through his § 2241 habeas petition would appear to make his motion to amend futile, his motion is futile for one more reason as well. In this case, as stated above, Mr. Thelemaque's October 27, 1994 state narcotics conviction was not the sole basis for his removal; rather, his removal was based on two criminal convictions from 1989 that he does not challenge in this Court and that provide sufficient grounds by themselves to remove him as an individual convicted of an aggravated felony and a narcotics crime. *See* Transcript of Proceedings before Immigration Judge dated Apr. 27, 1999, attached to Respondents' Mem. of Law in Opp'n [3:04CV1727(MRK) (member) doc. # 6], at Ex. A, at 29–30. Thus, Mr. Thelemaque's motion to amend related to the October 27, 1994 state narcotics

conviction also appears to be futile because, from the record before the Court, he is removable with or without this conviction.

Accordingly, Petitioner's Motion to Amend his Petition for Writ of Habeas Corpus [3:04CV676(MRK) (lead) doc. # 19] is DENIED.

## VI.

To summarize, the Court hereby:

(1) CONSOLIDATES Petitioner's two pending habeas petitions, *Thelemaque v. Ashcroft et al.*, No. 3:04CV676(MRK) (lead case), and *Thelemaque v. Department of Homeland Security*, No. 3:04CV1727(MRK) (member case);

(2) SUBSTITUTES newly appointed Attorney General Alberto Gonzales for former Attorney General John Ashcroft as a Respondent, and adds Michael Chertoff, the newly appointed Secretary of the Department of Homeland Security, Bruce Chadbourne, the District Director for the Boston BICE Detention and Removal Field Office, and George Sullivan, Interim Officer in Charge for the Hartford BICE Detention and Removal Office as additional Respondents in 3:04CV676(MRK) (lead);

(3) DENIES Petitioner's habeas petition in 3:04CV676(MRK) (lead) [doc. # 1];

(4) DENIES Petitioner's Motion for a Temporary Restraining Order in 3:04CV676(MRK) (lead) [doc. # 6];

(5) DENIES Petitioner's habeas petition in 3:04CV1727(MRK) (member) [doc. # 1]; and

(6) DENIES Petitioner's Motion to Amend his Petition for Writ of Ha-

beas Corpus [3:04CV676(MRK) (lead) doc. # 19].

**The Clerk is directed to close this file.**

IT IS SO ORDERED.